UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 0:11-CIV-61740-COHN/SELTZER

ESTETIQUE INC. USA, a Florida corporation,

      Plaintiff,

V.

XPAMED LLC, a Florida corporation,
MARIO GUASTELLA, an individual,
and JOSE MONTILLA, an individual,

      Defendants.

_____/

## <u>ORDER GRANTING IN PART MOTION FOR PRELIMINARY INJUNCTION</u>

**THIS CAUSE** is before the Court upon Plaintiff's Motion for a Preliminary Injunction [DE 6], Defendants' Responses to the Motion [DE's 9 and 25], Plaintiff's Reply [DE 28], and Defendants' Motion to Dissolve the Temporary Injunction [DE 30]. The Court has carefully considered these filings, the argument of counsel and the evidence presented on September 2 and 9, 2011, including the credibility of witnesses, and is otherwise fully advised in the premises.

## I. BACKGROUND

Estetique Inc., USA ("Estetique" or "Plaintiff") seeks a preliminary injunction against Defendant Xpamed, LLC, a competitor business founded by Defendant Mario Guastella ("Guastella"), a former employee of Plaintiff.  Xpamed, Guastella and Xpamed sales consultant Jose Montilla ("Montilla"), another former employee of Plaintiff, are allegedly using Plaintiff's confidential customer information to sell similar products to these customers.  Plaintiff's Complaint alleges claims for false advertising (Count I) and unfair competition (Count II) under the federal Lanham Act; breach of

contract against Guastella and Montilla for violations of non-compete agreements signed by them (Counts III and IV), misappropriation of trade secrets under Florida law (Counts V), and common law conversion claim (Count VI).  The Court granted an *ex parte* temporary restraining order ("TRO") when the case was filed [DE 8], though the TRO was not effective until August 10, 2011, when Plaintiff posted the required $25,000 bond [DE 10].  After Defendants twice moved for extensions, the TRO was extended without objection until September 2, 2011, the first day of the hearing [DE 15].  When the hearing could not be completed that day, the Court extended the TRO and completed the hearing on September 9, 2011.

## II.  FINDINGS OF FACT[1]

1.    Estetque, which operates primarily from its office in Miramar, Florida, is a distributor/seller of aesthetic and beauty equipment for spas, medical spas and professional aesthetic centers in the United States, the Caribbean, Central and South America, and Mexico.  Plaintiff also maintains local offices in several Central and South American countries.  Testimony of Moshe Segebre ("Segebre").[2]

2.    Plaintiff primarily sells five products of aesthetic and beauty equipment, which are used for a variety of treatments: (a) RejuveMax, an anti-aging collagen bed

---

[1]  The Court has received proposed findings of fact from each party.  These documents have been filed in the docket of this case and served on all opposing parties [DE's 34 and 35].  Due to the detailed nature of the evidence in support of and opposition to the preliminary injunction motion, the Court does incorporate verbatim certain portions of both Plaintiff's and Defendants' Proposed Findings, though this Court has made an independent judgment that these findings are correct.  Cf. Bright v. Westmoreland County, 380 F.3d 729 (3rd Cir. 2004).

[2]  Nearly all of the evidence regarding Plaintiff's business comes from the testimony of Moshe Segebre.

manufactured by Hapro International in the Netherlands; (b) LipoMax RF, a body contouring device; (c) LumiMax, a device for skin improvement; (d) LumiMax PL, a device using fractional pulsed light whose stated uses include hair removal, photo-rejuvenation, acne treatment and vascular treatment; and (e) DermaMax, a device using microdermabrasion technology.

3.    Estetique offers sales and customer support services in connection with these products.

4.    Plaintiff relies on a combination of its sales personnel and internet presence to market and sell its products and services.  Plaintiff generates leads from its website, and its sales force travels to Central and South America to meet directly with plastic surgeons, spa owners, and others in the industry in an attempt to promote its sales.

5.    Estetique's internet presence through the company's website is an important component of new and repeat business.

6.    The market for Plaintiff's products is highly competitive.  Estetique's success is dependent, in part, on its ability to protect its proprietary technology and customer information (both current and prospective).  Estetique has spent over ten years developing this proprietary customer information.

7.    Estetique's customer information, such as names, contact information and product needs, gives Estetique a continuing competitive advantage.  Much of this information includes customers' private cell phone numbers, private e-mail addresses, and information concerning their specific product needs.  Plaintiff compiled this information through in-person meetings, prior sales, seminars and contact through its website.  This information, in the manner that Estetique

3

maintains it, is not generally known and would be difficult to duplicate.

8. Estetique limits access to its proprietary customer database, in addition to the requirement that employees sign confidentiality and non-competition agreements.

9. In October 2008, Estetique hired defendant Montilla as a member of its sales team, allowing Montilla to market Plaintiff's products and services to Plaintiff's customers.

10. In June 2010, Plaintiff hired defendant Guastella as a web designer, responsible for maintaining and designing Plaintiff's internet presence.

11. As a condition of their employment, both Montilla and Guastella executed an "Agreement Regarding Inventions, Confidentiality and Non-Competition" (the "Agreement") which, among other things, provides for the protection of Plaintiff's "Proprietary Information" (defined to include customer lists and marketing or sales information), a non-competition period of five years post-termination of employment, and a customer non-solicitation period of five years post-termination of employment.  Plaintiff's Exhibits 1 & 2.

12. Montilla's and Guastella's obligations with respect to non-competition are set forth in Paragraph 7 of the Agreement:

> During the term of my employment with the Company, and for a period of **five (5) years** thereafter, regardless of reason for termination, I will not, directly or indirectly, whether as owner, partner, shareholder, consultant, agent, employee, co-venturer or otherwise, engage, participate or invest in any business activity in the Restricted Region with respect to the Products and Services.[3]  I understand and agree that the restrictions set

---

[3]  "Products and Services," as defined in Paragraph 1(e) of the Agreement, "means individually and collectively the development, manufacture or marketing of products, or performance or marketing of services which are competitive with or similar

forth in this Section 7 are intended to protect the Company's reasonable competitive business interests, its interest in its Proprietary Information and established and prospective customer relationships and goodwill, and agree that such restrictions are reasonable and appropriate for this purpose. For purposes hereof, the "Restricted Region" shall mean any state or location in which the Company operates and conducts its business or into which the Company directs its services.

13.     Montilla's and Guastella's obligations with respect to non-solicitation of Estetique's clients and suppliers are set forth in Paragraph 8 of the Agreement:

> During the term of my employment with the Company and for five (5) years thereafter, regardless of reason for termination, I will not, in any capacity, directly or indirectly: (a) solicit the business or patronage of any Customer for any other person or entity for the purpose of providing Products and Services; (b) divert, entice or otherwise take away from the Company the business or patronage of any Customer, or attempt to do so; (c) solicit or induce any Customer to terminate or reduce its relationship with the Company; (d) provide or assist with the provision of Products and Services to a Customer (except in his capacity as an employee of the Company); (e) refer a Customer to another provider of Products and Services or (f) purchase products for any reason whatsoever from any individual or entity that supplies, or has at any time ever supplied, the Company with products.

14.     Estetique subscribes to a web-based application known as EmailBrain for purposes of managing its e-mail, marketing and sales.  Substantially all sales and marketing information, including client and prospective client contact information, is accessible from EmailBrain.

15.     Given the confidential and highly proprietary nature of the information stored in EmailBrain, Estetique limits access to the database to its sales force and

---

to the products or services of the Company, or products or services which the Company has under development or which are the subject of active planning at any time during my employment.

management.

16.   Guastella, who was hired by Estetique as a web designer in June 2010, was not provided access to EmailBrain as part of his day-to-day activities, but was given access for a specific task in September 2010.

17.   On September 14, 2010, Guastella packed up his personal belongings and never returned to work.  Guastella did not provide any notice to Estetique that he was leaving.

18.   Guastella testified that he was given a very lengthy assignment which would take a number of days to complete but which Segebre demanded he complete in only one business day.  When he did not, Segebre berated him in the presence of Guastella's fellow employees, whereupon Guastella resigned.

19.   When Guastella left, he was in possession of certain confidential information of Estetique, including web server passwords/login information that no other Estetique employee possessed.

20.   As a result, Estetique withheld Guastella's final paycheck until such time that he returned the information to Estetique.  In November 2010, without having received the information from Guastella, Estetique relented and sent the final check to Guastella.  The parties dispute whether Guastella was working for Estetique during the period from September 14, 2010 to the issuance of his final check in November 2010.  Resolution of this factual dispute is not material to the Court's resolution of the present motion.

21.   Estetique did not change the EmailBrain password for several weeks after Guastella left.  On October 1, 2010, someone from an internet protocol (IP) address belonging to Guastella obtained access to Plaintiff's EmailBrain

database.

22.   Estetique employed Montilla as a member of its sales force until March 9, 2011. According to Segebre, Estetique terminated Montilla's employment as a result of poor sales performance, unsatisfactory reviews, and because Montilla had several times been found to be providing inaccurate or false information to Estetique's clients about the products Montilla was selling.

23.   Montilla testified that even though he applied his skills to his job diligently and was successful at selling Estetique's products, his employment was abruptly terminated when he became ill, called in sick, and refused to return to work when he was demanded to do so by Segebre.

24.   During his employment with Estetique, Montilla was not provided with access to EmailBrain, but was provided with access to lists of contact information for customers and prospects assigned to him.

25.   On September 28, 2010, shortly after he physically left Estetique, Guastella registered the domain name http://www.Xpamed.com.  Xpamed is a company based in Miami, Florida whose main objective is to design, produce, assemble, sell and distribute high-tech equipment for the cosmetic industry worldwide.

26.   Xpamed's website lists for sale spa and beauty equipment that is substantially similar to the equipment sold by Estetique.  For example, among the various categories of items listed for sale on Xpamed's website are medical spa equipment, collagen beds, photo rejuvenation equipment, microdermabrasion equipment, and radio frequency treatment equipment – the same categories of equipment Estetique sells.

27.   Although Xpamed claims to sell 150 different products in 42 different categories,

the testimony of Defendants Montilla and Guastella did not substantiate this claim.

28.   Montilla and Guastella testified that they focus Xpamed's sales on laser-based products, which are more advanced than Plaintiffs' products.  Xpamed's target market per device is in the $15,000 to $30,000 market range, while Plaintiff's average sales price is approximately $40,000.

29.   Guastella testified that Xpamed's product line is based primarily on laser technologies and designed for "invasive" procedures which can only be performed by highly skilled medical practitioners or technicians.

30.   The Court finds that despite this emphasis on laser-based products, Defendants' products still perform the same functions as those sold by Plaintiff, and are competitive with and similar to Plaintiffs' products.  The evidence shows that if a customer were to purchase a hair-removal device from Defendants, they would not also purchase Plaintiff's products.  Although it may be based upon a different technology, Xpamed's products substitute for Plaintiff's products in the marketplace.

31.   Xpamed has taken content directly from Estetique's website. For example, Xpamed's website contained a press release, located at http://xpamed.com/Press%20Release.html, under the heading "Xpamed launches new line of IPL aesthetic equipment."  Plaintiff's Exhibit 4.

32.   Guastella admitted during the September 2 hearing on the Injunction Motion that the Xpamed press release is a verbatim copy of a July 2010 Estetique press release.  Plaintiff's Exhibit 5.  Although he referred to his conduct as a "mistake," Guastella admitted to intentionally copying the press release and changing all

references from Estetique to Xpamed.  He then posted the press release on the
Xpamed website.

33.   Although the Xpamed domain name was registered in September 2010, the
website did not go "live" until December 2010, at which time Xpamed began
actively targeting Estetique's clients and competing against Estetique by offering
for sale similar medical spa and aesthetic equipment as those sold by Estetique.

34.   Montilla and Guastella testified that they only obtained customer information
from publicly available sources, such as an email search program called EmEx3.

35.   Guastella testified that Xpamed used a different software program to create its
website, and relies upon an organic search engine optimization technique to
attract interested parties, rather than the "pay to click" strategy employed by
Plaintiff when he was employed there.

36.   Xpamed relies upon its online store to market its products and inquiries
generated through the online store are followed up by Montilla, who addresses
customer questions leading up to sales.

37.   Further, Xpamed began targeting Estetique's customers through both e-mail and
telephone solicitations.  Plaintiff's Exhibits 6, 7 and 8.

38.   The e-mail solicitations contain in-line images of equipment being sold by
Xpamed – equipment that is similar in look and function to that sold by Estetique,
but at a substantially lower price.  Id.

39.   In addition, certain of Xpamed's e-mail solicitations and its website identify
Xpamed's collagen beds (allegedly purchased from ProSun, the U.S. distributor
of Hapro International – the same manufacturer from which Estetique purchases
its collagen beds) as "FDA Approved."

40.  The Defendants' sole evidence that these collagen beds are "FDA Approved" is a "Certificate to Foreign Government" issued by the FDA with respect to certain tanning beds sold by ProSun.  The Certificate to Foreign Government does not state that these beds are approved by the FDA nor does it grant any authorization to market them as such.

41.  Segebre testified that Estetique does not market its own Hapro-manufactured collagen bed (the RejuveMax) as "FDA Approved" because it is Segebre's understanding that the FDA does not "approve" these devices and specifically prohibits the marketing/advertising of these devices as approved.  Estetique is unaware of any competitor, other than Xpamed, that markets collagen beds as approved by the FDA.

42.  Segebre learned about Xpamed's e-mail and telephone solicitations from several of Estetique's customers who received them and forwarded or showed the emails to him.

43.  Segebre testified that these customers were contacted via their private cell phone numbers and/or private e-mail addresses, information which is not publicly available or in the public domain.  In addition, certain of these customers were not affiliated with the medical spa/aesthetic industry (such as private investors).

44.  According to the Defendants, Xpamed purportedly compiled all of its contact information from publicly available sources, including but not limited to software known as "Email Extractor."  The Defendants did not, however, present any evidence that the contact information of the customers specifically identified in Estetique's moving papers or referenced at the injunction hearing could be obtained from these public sources.

45.   As a web developer for Plaintiff, Guastella never had any contact with Estetique's customers and prospective customers during his time at Estetique.

46.   As a sales person for Plaintiff, Montilla was responsible for contacting individuals and entities in Estetique's customer database to solicit their business.

47.   Prior to his termination of employment, Montilla was actively soliciting a customer in South America, Dr. Rada, for the purchase of one or more of Estetique's devices.

48.   Shortly after his employment was terminated by Estetique, Guastella hired Montilla to work as a salesperson for Xpamed.

49.   Montilla does not, however, use his own name when conducting business for Xpamed.  Rather, he works under the alias "Danny" or "Daniel Avila," a name he did not use or ever mention during his three years at Estetique.

50.   The "Daniel Avila" Facebook account was created on or around April 28, 2011 (approximately one month after Montilla was fired), and almost immediately began posting information in support of Xpamed.

51.   "Daniel Avila" has contacted Estetique customers with whom he dealt with as "Montilla" while employed by Estetique.

52.   Montilla testified that he assumed the identify of Danny Avila because he wished to dissociate himself from Estetique, and avoid any confusion with any potential customers.

53.   Montilla further testified that he only dealt with customers who made inquiries of Xpamed and did not "cold call" any customers.

### III.  CONCLUSIONS OF LAW

### A.  Preliminary Injunction Standard

11

In order to obtain a preliminary injunction, Plaintiff must establish the following four elements: (1) a substantial likelihood that it will prevail on the merits; (2) a substantial threat that it will suffer irreparable injury if the injunction is not granted; (3) the threatened injury to plaintiff outweighs the threatened harm the injunction may do to the defendants; and (4) granting the preliminary injunction will not disserve the public interest.  Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir.1994).  Because a "preliminary injunction is an extraordinary and drastic remedy," it is "not to be granted until the movant clearly carries the burden of persuasion as to the four prerequisites." Id. (quoting Northeastern Fl. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir.1990)); see also McDonald's Corp. v. Roberts, 147 F.3d 1301, 1306 (11th Cir. 1998).

### B.  False Advertising and Unfair Competition Claims

To establish a likelihood of success on the merits of a false advertising claim under the Lanham Act:

> the movant must demonstrate the following: "(1) the ads of the opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects interstate commerce, and (5) the movant has been-or is likely to be-injured as a result of the false advertising." *Johnson & Johnson,* 299 F.3d at 1247.

North American Medical Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1224 (11th Cir. 2008).

In an argument raised for the first time in their motion to dissolve the temporary restraining order (filed minutes before the continuation of the preliminary injunction hearing on September 9, 2011), Defendants contend that Plaintiffs lack standing to

bring these claims.  Rather than engage in a standing analysis at this time, the Court concludes that the admissible evidence does not show a substantial likelihood of success on the merits of a false advertising claim regarding the elements of whether the deception had a material effect on purchasing decisions and whether the misrepresented product affects interstate commerce.  Statements made by their customers to Segebre about their confusion were not admitted into evidence due to a hearsay objection.  Thus, there is no evidence regarding those purchasing decisions, other than a large inference from Moshe Segebre's testimony regarding decreased traffic to Plaintiff's website.  While this may be evidence of injury, it is not sufficient to show a likelihood of success on the merits of a false advertising claim.

As for the claim in Count II for unfair competition under the Lanham Act, Plaintiff alleges that Defendants used confidential customer information to market goods as "FDA approved," when they were not so approved.  Defendants rely upon a "Certificate to Foreign Government" for their claim.  Plaintiff puts forth legal argument and also testimony from Moshe Segebre that this Certificate does not mean that a product may be represented as "FDA Approved."  The Court concludes that Plaintiff has not shown a substantial likelihood of success on the merits that this claim is in fact false.  In addition, even if it was false adverstising, Defendants contend that there is no evidence whether foreign customers are likely to be influenced by whether or not a product is "FDA Approved."  While the Court believes such influence is likely, the Court concludes that Plaintiffs have not shown a substantial likelihood of success on the merits for an unfair competition claim based upon this allegedly false representation.[4]

---

[4]  Although not described in their Complaint, Plaintiffs also appear to seek relief based upon Defendants' use of the term "SpaMed."  Plaintiffs apparently began using the term "Spamed Solutions" as a marketing campaign.  Plaintiffs contend that

## C.  Breach of Contract – Employment agreement

In Autonation, Inc. v. O'Brien, 347 F.Supp.2d 1299, 1304 (S.D. Fla. 2004), the

legal standard for enforcement of a restrictive employment agreement under Florida law

was put forth:

> Under Section 542.335 of the Florida Statutes, restrictive
> covenants are valid if the employer can prove: (1) the existence of one or
> more legitimate business interests justifying the restrictive covenant; and
> (2) that the contractually specified restraint is reasonably necessary to
> protect the established interests of the employer. *North American
> Products Corp. v. Moore,* 196 F.Supp.2d 1217, 1228 (M.D.Fla.2002). If
> the employer can establish its *prima facie* case, the burden shifts to the
> employee to show that the restriction is overbroad, overlong, or otherwise
> not reasonably necessary to protect the established interests of the
> employer. Fla. Stat. 542.335(1)(c). Additionally, when the employer
> establishes a legitimate business interest, irreparable injury must be
> presumed and the burden shifts to the employee to establish the absence
> of such injury. Fla. Stat. 542.335(1)(j); *North American Products Corp.,*
> 196 F.Supp.2d at 1228; *Don King Prods., Inc. v. Chavez,* 717 So.2d 1094,
> 1095 (Fla. 4th DCA 1998).
>
> Pursuant to Florida's statute, "legitimate business interests"
> include: trade secrets, valuable confidential business information,
> substantial relationships with specific prospective or existing customers,
> customer goodwill, and extraordinary or specialized training. Fla. Stat.
> 542.335(1)(b). Moreover, courts are statutorily required to construe a
> restrictive covenant in favor of providing reasonable protection to all
> legitimate business interests established by the person seeking
> enforcement. Fla. Stat. 542.335(1)(h); *AutoNation, Inc. v. Maki,* 2004 WL
> 1925479, *3 (Fla.Cir.Ct. Aug. 25, 2004).
>
> In Florida, confidential business information is considered a
> legitimate business interest that can be protected by a restrictive covenant
> in an employment contract. *New Horizons Computer Learning Centers,
> Inc. v. Silicon Valley,* 2003 WL 23654790, *6 (M.D.Fla. Nov. 12, 2003).
> However, information that is commonly known in the industry and not
> unique to the allegedly injured party is not confidential and is not entitled
> to protection. *Anich Indus., Inc. v. Raney,* 751 So.2d 767, 771 (Fla. 5th
> DCA 2000) (citing *Keel v. Quality Med. Syst., Inc.,* 515 So.2d 337-38 (Fla.

---

Defendant Xpamed's name, when pronounced in Spanish, sounds substantially similar
to, if not an exact copy of, "Spamed."  The Court concludes that Plaintiffs have not
shown a substantial likelihood of success that consumers are confused by Defendants'
use of their name.

3d DCA 1987)).

### 1.  Confidential Business Information

Plaintiff contends that its confidential client information qualifies as a "trade secret" or "confidential business information," either of which is a "legitimate business interest" under Florida law. The Court concludes Plaintiff has not shown that this information is a trade secret under Florida law.  Plaintiff, however, has shown a substantial likelihood of success that Defendants used confidential client information. Moreover, even if Plaintiff had not proven that Defendants used confidential customer information, Plaintiff has proven that Defendants have solicited Plaintiff's customers in violation of the Agreement.  Even though some email addresses were available by public searches, an alternative method of proving a legitimate business interest under Florida law is proving that Plaintiff had substantial relationships with specific prospective or existing customers.

With regard to client contact information serving as a "valuable confidential business information," this Court previously addressed the issue of a compilation of client information, some of which could be publicly available.  In Continental Group, Inc. v. KW Property Mgmt., LLC, 622 F.Supp. 2d 1357, 1374-75 (S.D. Fla. 2009), a dispute between competing property management companies, this Court stated:

> Although viewed in isolation much of this information could be discovered by competitors by contacting condominium associations or industry sources, the Court concludes that the work and labor expended by Plaintiff in compiling the information, whether board contacts in a county, on-site employee checklists, hurricane preparedness, or environmentally related ("green") improvements, plus Plaintiff's judgment as to the inclusion of the selected information, raises the level of the information to

valuable confidential business information in their final compiled form.[5]
Thus, such compilations are valuable for a business or a competing
business.  In this case, KW has benefitted from its receipt, via Kravit, of
the compiled information detailed in the Findings of Fact section of this
Order.  These compilations have not only saved KW numerous work
hours in obtaining the information and in deciding what to include in the
contacts lists, checklists, procedures, and other on-site documents, but
have instantly made KW's on-site operations appear more professional to
the client base of both TCG and KW.  Thus, the information also qualifies
as having a legitimate business interest in client goodwill associated with
the specific marketing or trade area of property management for
condominium associations.  The Court concludes that Plaintiff has shown
a substantial likelihood of success on the merits that it has a legitimate
business interest in its non-compete, non-solicitation agreement with
Defendant Kravit and that Kravit breached the contract by using
documents belonging to TCG in her employment with KW.

While Defendants are correct that the level of evidence regarding the taking of

confidential information by Defendants from Plaintiff is not as strong as it was in the

Continental Group case, it is clear to this Court that Defendants solicited Plaintiff's

customers with some non-public information obtained from Plaintiff's database, in

violation of the Agreement.  See Plaintiff's Exhibits 6, 7 and 8.

### 2.  Solicitation of Employees

Plaintiff also asserts that Guastella breached the non-competition agreement by

soliciting Montilla to join Xpamed.  Defendants argue that Montilla had already been

terminated by Plaintiff at the time he was hired by Xpamed.  However, the Agreement

signed by Guastella clearly forbids hiring any individual who had been employed by the

---

[5]  To draw an analogy from copyright law, compilations can even be
copyrightable.  Feist Publications, Inc. v. Rural Telephone Service Co., Inc., 499 U.S.
340, 356 (1991), citing 17 U.S.C. § 101 ("A 'compilation' is a work formed by the
collection and assembling of preexisting materials or of data that are selected,
coordinated, or arranged in such a way that the resulting work as a whole constitutes an
original work of authorship. . . .").

Company within a two year period preceding Guastella's termination. This would include Montilla, who had garnered valuable confidential business information regarding Plaintiff's clients while employed as a sales representative. Guastella therefore also breached the non-solicitation of employee provision of his Agreement.

### 3.  Similar Products

Defendants contend that they have not breached the Agreement because the products they sell are not similar to Plaintiff's products. The Court notes that the Agreements state that Defendants cannot market products which "are competitive with or similar to the products or services of the Company." As discussed in its Findings of Fact, the Court concludes that while not exactly the same, Xpamed's products compete with Plaintiff's products in the same marketplace. This activity violates the plain language of the Agreement.

### 4.  Unclean Hands Defense

Defendants assert that Plaintiff is not entitled to injunctive relief because Defendants Guastella and Montilla were each constructively discharged by Plaintiff. Even taking the disputed facts described above in a light more favorable to Defendants, a single instance of a supervisor/owner "berating" an employee does not create an environment which rises to the level of a constructive discharge as to Defendant Guastella. The facts as presented by Guastella do not rise to the level necessary to preclude injunctive relief based upon his non-competition agreement. As for Defendant Montilla's claim that he was terminated for calling in sick one day, when combined with Segebre's testimony regarding Montilla's job performance, the Court also concludes that no constructive discharge has been shown by Defendants.

<u>4.  Reasonable Necessity of Restrictions</u>

Defendants attack the enforceability of the Agreements, contending that under Fla. Stat. § 542.335(1)(d)(1), a period of restraint of greater than two years is presumed unreasonable.  Plaintiff argues that because there is a separate five year ban on non-solicitation of customers in the Employment Agreement, which it believes constitutes a trade secret ban, that the five year term is reasonable as a protection of trade secrets, and governed by Fla. Stat. § 542.335(1)(e).  However, as noted above, Plaintiff has failed to show a substantial likelihood of success that its confidential customer information rises to the level of a trade secret.

The restrictive covenant in this action is therefore overbroad as to a reasonable period of time.  While Plaintiff has shown that some specified restraint is reasonably necessary to protect the established interests of the employer, a five year period is unreasonable.  The Court has the authority under Florida law to "modify the restraint and grant only the relief reasonably necessary to protect such interest."  Fla. Stat. § 542.335.  In this case, the Court concludes that a reasonable time period would extend until August 10, 2012.  This period is one year from imposition of the temporary restraining order, and less then two years from when Guastella and Montilla left Plaintiff's employ.

Defendants also challenge the geographic scope of the restriction.  In that regard, the Agreement initially appears limitless, in that its restricts former employees from any geographic area in which Plaintiff does business or intends to do business. The Court can rationally construe this provision to be limited to the areas that the evidence shows Plaintiff operates in:  the United States, Central America (including

18

Mexico), South America, the Caribbean and South America.  That does leave the European and Asian markets open to Defendants without restriction.

### D.  Conversion Claim

Plaintiff also asserts a claim for conversion of confidential and proprietary information.  The elements of conversion in Florida as: "(1) an act of dominion wrongfully asserted; (2) over another's property; and (3) inconsistent with his ownership therein."  Special Purpose, 125 F.Supp.2d at 1099-1100, *citing* Warshall v. Price, 629 So.2d 903, 904 (Fla. 4th DCA 1993), *rev. den*., 641 So.2d 1346 (Fla. 1994).   As described above, although Plaintiff has shown that Defendants have contacted Plaintiff's customers by using confidential information, the Court concludes that Plaintiff has not demonstrated a substantial likelihood of success on the merits of a claim for conversion for this activity.  Absent the restrictive covenant, Defendants would not be subject to preliminary injunctive relief.

### E.  Remaining Preliminary Injunction Elements

Having found that Plaintiff has a substantial likelihood of success on the merits of its breach of contract against Defendants Montilla and Guastella, the Court turns to the other elements required for issuance of a preliminary injunction.

### 1.  Irreparable Harm

For violations of a covenant not to compete or solicit in compliance with Florida Statutes Section  542.335, upon a showing of legitimate business interest as in this case, irreparable harm is presumed, though Defendants can rebut this presumption.  As discussed above, Plaintiff has shown that the compilation of otherwise publicly available

information can be protected as confidential information.  The Court concludes that Defendants have not rebutted the presumption of irreparable harm.

### 2.  Balance of the Harm to the Parties

Defendants argue that Plaintiff cannot (as of yet) quantify any measurable damages due to loss of any clients, yet it seeks to ban Guastella and Montilla from developing their start up business.  While the Court acknowledges that Defendants would be harmed by such a remedy, it is Defendants Guastella and Montilla who breached their contract with Plaintiff.  Moshe Segebre testified that Plaintiff's sales have diminished since Defendants began their business.  Thus, some injunctive relief is necessary to enforce the contracts.

### 3.  Public Interest

Defendants assert that restraining competition will injure the public at large, since Defendants sell their products at a substantially lower cost than Plaintiff.  As this Court noted in Continental Group, "the public interest also requires adherence to contracts and fair competition."  622 F.Supp. 2d at 1378.  In this case, Defendants have used a substantial shortcut to completing sales by contacting Plaintiff's clients and using the information they gained while employed by Plaintiff to make their own sales at Plaintiff's expense.  These actions, taken in violation of their contractual agreements, require injunctive relief to remedy these breaches that does outweigh the public interest in business competition.

## III.  CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1.    Plaintiff's Motion for a Preliminary Injunction [DE 6] is hereby **GRANTED in part** as to the breach of contract claims and **DENIED in part** as to the other claims in the Complaint;

2.    Defendants' Motion to Dissolve the Temporary Injunction [DE 30] is hereby **DENIED**;

3.    Defendants Mario Guastella and Jose Montilla, individually and collectively, together with Xpamed, LLC, their respective agents, servants, employees, attorneys, accountants, and all persons acting in concert with them or under their inducement, encouragement or persuasion, are enjoined and restrained from performing any of the following acts, directly or indirectly, on their own behalf or on behalf of any third party:

   a.    using or causing to be used, or disclosing in any manner, any confidential client information obtained from the Plaintiff, including without limitation client and prospective client information, and information relating to or regarding Plaintiff's business;

   b.    for a period extending from today through August 10, 2012, contacting any of Plaintiff's customers for the purpose of selling products or services as defined in the Non-Competition Agreement;

   c.    for a period extending from today through August 10, 2012, soliciting or attempting to solicit or induce any of Plaintiff's employees to leave

Plaintiff's employment;

d.      for a period for a period extending from today through August 10, 2012, diverting, soliciting, or taking away any customer of Plaintiff for the purpose of selling products or services within the United States or any country within Central America, South America or the Caribbean.

4.      The Court will set this case for trial by separate order.

   **DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 14th day of September, 2011.

                                         JAMES I. COHN
                                         United States District Judge

Copies furnished to counsel of record on CM/ECF